UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | |
| v. | Case Nos. 3:17-CR-30 JD<br>3:18-CR-87 JD<br>3:21-CV-291 JD<br>3:21-CV-289 JD |
| PHILLIP J. YODER | |

# OPINION AND ORDER

After entering into a plea agreement with the Government, Defendant Philip Yoder pleaded guilty on February 28, 2019, in Cause 3:17-CR-30, to the charges of Wire Fraud, Mail Fraud, and Bank Fraud. At the same time, he pleaded guilty in Cause 3:18-CR-87 to a one-count Indictment charging him with bankruptcy fraud. The Court held a combined sentencing hearing in both cases and sentenced Mr. Yoder to 87 months of imprisonment on each of the three counts in the first case and 60 months of imprisonment on the one count in the second case, all to run concurrently, for a total term of 87 months. Mr. Yoder filed in each case a motion pursuant to 28 U.S.C. § 2255 requesting that his guilty pleas and sentences be vacated. In a previous Order (Op. & Order, DE 181),[1] the Court disposed of his claims for violation of due process rights and ineffective assistance of counsel at sentencing but found that an evidentiary hearing was needed for the claim that his counsel was ineffective during plea negotiations. After several delays caused by medical emergencies (*see* DE 188 and 192), the Court held an evidentiary hearing on the remaining claim. Having considered the evidence presented at the hearing and the testimony

---

[1] Unless indicated otherwise, all docket citations are to Cause 3:17-CR-30.

of Mr. Yoder's prior counsel, the only witness to testify, the Court will deny his remaining claim and will dismiss his motions under § 2255.

### A. Background

#### (1) *Procedural Background*

The procedural posture of the two cases against Mr. Yoder has been described in the Court's previous order (Op. & Order, DE 181) and need not be repeated in great detail here. Mr. Yoder was charged in Cause 3:17-CR-30 with committing wire, mail, and bank fraud involving his scheme to cheat homeowners who were facing foreclosure. In a separate case, Cause 3:18-CR-87, he was charged with bankruptcy fraud arising out of a bankruptcy filing in which he falsely claimed as an asset a "billion dollar gold bond." Both cases were prosecuted simultaneously.

On February 15, 2019, Mr. Yoder filed a combined plea agreement in each case. According to the plea agreement, Mr. Yoder stated that he offered his plea "freely and voluntarily and of [his] own accord, and no promises have been made to [him] other than those contained in this petition, nor [has he] been threatened in any way by anyone to cause [him] to plead GUILTY in accordance with this petition." (Plea Agreement, DE 113 ¶ 12.) In addition, at the change-of-plea hearing before a magistrate judge, Mr. Yoder was asked under oath whether "anyone threatened [him] or anyone else, forced or pressured [him] or anyone else to make [him] plead guilty today," and he responded "No, sir." (Plea Hearing Tr., DE 120 at 30.) He also responded that no one, including Mr. Wemhoff, had made any promises or predictions to cause him to plead guilty. (*Id*. at 30–31.)

On March 18, 2019, the Court accepted the magistrate judge's report and recommendation and accepted Mr. Yoder's guilty plea to Counts 1 (wire fraud), 6 (mail fraud), and 9 (bank fraud) of the superseding indictment in Cause 3:17-CR-30 as well as his guilty plea to bankruptcy fraud in Cause 3:18-CR-87. Again, he was then sentenced to 87 months of imprisonment on each of the three counts in the first case and 60 months of imprisonment on the one count in the second case, all to run concurrently, for a total term of 87 months.

### (2) *Evidence from the Hearing*

In his remaining claim under § 2255, Mr. Yoder insists that he received ineffective assistance of counsel during his plea negotiations. Mr. Yoder submits that Mr. Wemhoff was ignorant of what sentence he could receive if convicted at trial and threatened that he would be sentenced to a lifetime of imprisonment unless he accepted the Government's plea offer. To determine the veracity of these allegations, the Court held an evidentiary hearing. (DE 195.)

Mr. Wemhoff was the only person called to testify at the hearing. The Court finds his testimony to be credible. The Court makes this finding based on Mr. Wemhoff's demeanor, the lack of inconsistencies in his testimony, and the detailed nature of his testimony.

Mr. Wemhoff has been an attorney since 1988. (Tr. at 8.) He began representing Mr. Yoder in this case in June 2017. (*Id.* at 10.) After the superseding indictment was filed in January 2018, Mr. Yoder absconded from the jurisdiction. During that time, Mr. Yoder had no contact with Mr. Wemhoff. He was arrested and brought back to the Northern District of Indiana in January 2019 and detained at the St. Joseph County Jail. (*Id.* at 11.)

Shortly after that, on January 18, 2019, Mr. Wemhoff sent a letter to Mr. Yoder providing a preliminary evaluation of the case against him. (Wemhoff Letter, Gov't Exh. 1.) Four days

3

later, Mr. Wemhoff sent another letter in which he estimated, among other things, that Mr. Yoder's Sentencing Guidelines range would be 57–71 months of imprisonment if he entered into a plea agreement with the Government. (Wemhoff January 22, 2019, Letter at 4.)

Mr. Wemhoff also met with Mr. Yoder at the jail at least six times before he pleaded guilty on February 28, 2019. (Tr. at 15.) They discussed the interplay between the wire, mail, and bank fraud counts and the bankruptcy fraud count. (*Id*. at 13.) Mr. Wemhoff addressed the possible grouping of the charges under the Guidelines (*id*. at 13), telling Mr. Yoder that the probation department believed that the grouping would favor him. (*Id*. at 14.) Among other things, he explained how Mr. Yoder's criminal history, the loss amount, his absconding, and failure to pay restitution in an earlier case could implicate his ultimate sentence. (*Id*. at 15–17.)

During his meetings with Mr. Yoder, Mr. Wemhoff advised him that the Court had discretion to "stack" his sentences. (Tr. at 11–12.) He explained that the Guidelines were advisory and that the Court would be considering the section 3553(a) factors in sentencing him. (*Id*. at 12.) Mr. Wemhof did not inform Mr. Yoder that the Court could vary its sentence upward but the magistrate judge informed him of this at the change of plea hearing. (*Id*. at 12.) Finally, Mr. Wemhof advised Mr. Yoder that the Court could sentence him up to the statutory limits. (*Id*. at 12.)

Once the Government made a plea offer, they discussed it as well. Mr. Wemhoff never told Mr. Yoder to take the plea but did explain how it could affect his case. According to Mr. Wemhof, Mr. Yoder was eager to take the plea:

> Q. Did you recommend that he take the plea offer from the government?
>
> A. I don't recall I recommended it, but I do recall that he said to me—he said, "I want to take the plea offer." I didn't pressure him. I didn't tell him to take the plea

>offer. He just said to me, "I'll take it because if I don't take it, they're going to hammer me." There was no screaming. There was no yelling. There was no threats.[2]
>
>Q. Did Mr. Yoder ever, during your meetings with him in January or February of 2019, ever express reluctance to take the plea offer from the government?
>
>A. No. He wanted to take it. He wanted to take it even after I told him that I had spoken with a witness who provided good information for his defense.
>
>Q. Is it accurate to say that you were neutral in your discussion with Mr. Yoder as to whether he should take the plea offer or go to trial?
>
>A. I present facts as I see them. I present, you know, what I think a possible sentence could be, and then I see what he would like to do. And so did I tell him to take the plea offer? No. That's ultimately his decision to take it. I can just tell him the good and the bad.
>
>Q. I appreciate hearing about your general practice. I'm a little more interested about what happened with Mr. Yoder. Were you neutral in whether he should take the plea offer or go to trial?
>
>A. Yeah, I think I was probably what I normally do. I was neutral. I said, "This is the situation. This is the information we just got, so we may be able to pursue it to trial." And he was very quick to just say, "No, I just want to plead."

(Tr. at 17–19.)

Mr. Wemhof did not tell Mr. Yoder what he would do if he was in Mr. Yoder's position. (*Id*. at 19.) Nor did Mr. Wemhoff tell Mr. Yoder that he would, or could, end up in prison for the rest of his life if he did not take the plea:

>Q. Did you ever tell Mr. Yoder that he would spend the rest of his life in prison if he did not take the plea?
>
>A. No, I never said that.
>
>Q. Okay. Did you ever tell him that he could spend the rest of his life in prison if he did not take the plea?
>
>A. No, I did not say that.

---

[2] Later in the hearing, Mr. Wemhoff repeated his assertion that he never raised his voice with Mr. Yoder. (*Id*. at 20.)

> Q. Did you ever tell Mr. Yoder that he would probably not get out of prison if he didn't take the plea?
>
> A. No, I never said that.

(*Id*. at 19.)

At the time of his conversations with Mr. Yoder, Mr. Wemhoff did not believe that Mr. Yoder could receive a maximum sentence or any sentence that would end up in his spending the rest of his life in prison:

> Q. Did you have a belief when you were speaking with Mr. Yoder that Mr. Yoder could, if convicted, receive a maximum sentence in the case?
>
> A. No, I did not, and the reason is, is because generally what the Court does—and this Court included— they sentence within the guidelines, and perhaps even below the guidelines if there are mitigating factors, one of which we were looking at for him was his mental state, which we never got information on.
>
> Q. In speaking with Mr. Yoder in January and February of 2019, did you have a belief that Mr. Yoder could receive consecutive sentences?
>
> A. It is possible for the Court to do that, and I have advised clients that because I have seen that. And so I advised him that that is a possibility. That is also something that is advised to all the clients by the magistrate judge during the arraignments.
>
> Q. In speaking with Mr. Yoder in January and February of 2019, did you have a belief that Mr. Yoder could receive a sentence that would result in Mr. Yoder spending the rest of his life in prison?
>
> A. No. No.

(Tr. at 20–21.)

Mr. Wemhoff took notes during each meeting with Mr. Yoder or shortly afterward, which were introduced into evidence by the Government. (*See* Gov't Exhs. 1 & 2.) The notes are written in shorthand, but they appear to corroborate Mr. Wemhoff's testimony about his discussions with Mr. Yoder regarding the applicability of the Guidelines.

6

Mr. Yoder did not testify at the hearing or present any evidence. But during these proceedings, the Court has considered his affidavit submitted with the motion under § 2255 in which he claims, among other things, that Mr. Wemhoff screamed, threatened, and told him that he "would spend the rest of [his] life in prison" and "would probably never get out of prison." (DE 156-1 ¶¶1 & 2).

**B.    Standard of Review**

Section 2255(a) of Title 28 provides that a federal prisoner "claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States . . . may move the court which imposed the sentence to vacate, set aside or correct the sentence." 28 U.S.C. § 2255(a). The Seventh Circuit has recognized that § 2255 relief is appropriate only for "an error of law that is jurisdictional, constitutional, or constitutes a fundamental defect which inherently results in a complete miscarriage of justice." *Harris v. United States*, 366 F.3d 593, 594 (7th Cir. 2004). Further, "a Section 2255 motion is neither a recapitulation of nor a substitute for direct appeal." *Olmstead v. United States*, 55 F.3d 316, 319 (7th Cir. 1995) (citation omitted). Relief under § 2255 is extraordinary because it seeks to reopen the criminal process to a person who has already had an opportunity of full process. *Almonacid v. United States*, 476 F.3d 518, 521 (7th Cir. 2007) (citing *Kafo v. United States*, 467 F.3d 1063, 1068) (7th Cir. 2006)).

**C.    Discussion**

In what's left of Mr. Yoder's motion under § 2255, he insists that he received ineffective assistance of counsel at the plea negotiation stage, in violation of the Sixth Amendment. The

Sixth Amendment provides a criminal defendant with the right to counsel, U.S. Const. amend. VI, and "inherent in this right is that the defendant is entitled to the effective assistance of counsel." *United States v. Recendiz*, 557 F.3d 511, 531 (7th Cir. 2009) (citation omitted). In order to prevail on his claim for ineffective assistance of counsel, Mr. Yoder must establish (1) that his counsel's performance was deficient and (2) that the deficient performance prejudiced the defense. *See Koons v. United States*, 639 F.3d 348, 351 (7th Cir. 2011) (quoting *Strickland v. Washington*, 466 U.S. 668, 687 (1984)). "Because counsel is presumed effective, the petitioner bears a heavy burden to prove that his counsel was ineffective and that his defense was actually prejudiced." *Barker v. United States*, 7 F.3d 629, 633 (7th Cir. 1993)

The first prong of the *Strickland* analysis requires that the Court determine whether counsel acted "outside the wide range of professionally competent assistance." *Strickland*, 466 U.S. at 690. "The question is whether an attorney's representation amounted to incompetence under prevailing professional norms, not whether it deviated from best practices or most common custom." *Koons*, 639 F.3d at 351 (citing *Sussman v. Jenkins*, 636 F.3d 329, 349 (7th Cir. 2011)). Furthermore, the Court "maintain[s] a strong presumption that the defendant received effective assistance," *Hardamon v. United States*, 319 F.3d 943, 948 (7th Cir. 2003), and that the challenged conduct "might be considered a sound trial strategy." *Strickland*, 466 U.S. at 689 (citation and quotation omitted).

The second prong of the *Strickland* analysis requires that there be a "reasonable probability that, but for the ineffective assistance, the result of the proceedings would have been different." *Recendiz*, 557 F.3d at 531. A "reasonable probability" that the result would have been different is a probability "sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694.

Here, the Court need not go further than the first prong of *Strickland*. "In the plea-bargaining context, . . . a reasonably competent lawyer will attempt to learn all of the relevant facts of the case, make an estimate of a likely sentence, and properly communicate the results of that analysis to the client before allowing the client to plead guilty." *Spiller v. United States*, 855 F.3d 751, 755 (7th Cir. 2017) (quoting *Bethel v. United States*, 458 F.3d 711, 717 (7th Cir. 2006) (citing cases)). The estimate must be made in good-faith "[b]ecause many questions about the facts and how a court or jury will apply the law to those facts cannot be answered by counsel with certitude, '[w]aiving trial entails the inherent risk that the good-faith evaluations of a reasonably competent attorney will turn out to be mistaken either as to the facts or as to what a court's judgment might be on given facts.'" *Bethel*, 458 F.3d at 717 (quoting *McMann v. Richardson*, 397 U.S. 759, 770 (1970)). The evidence from the hearing shows that Mr. Wemhoff complied with these requirements.

Mr. Yoder claims that Mr. Wemhoff pressured him into accepting the plea agreement because he erroneously believed that, if Mr. Yoder were convicted at trial, he'd be imprisoned for life. However, no evidence exists in support of that claim. Instead, the opposite is true: Mr. Wemhoff appropriately estimated a likely sentence and communicated his findings to Mr. Yoder before he chose to plead guilty.

Once Mr. Yoder was detained at the St. Joseph County Jail in January 2019, Mr. Wemhoff communicated often with Mr. Yoder in writing and in person. Mr. Wemhoff sent Mr. Yoder four letters (on January 18, 22, 23, and February 7). In each of those letters, Mr. Wemhoff explained the charges and, in two of them, he estimated the Sentencing Guidelines range, ultimately suggesting that his Guidelines range would be 57–71 months of imprisonment, but

9

upon a plea of guilty would come down to 41–51 months.[3] (Wemhoff Jan. 22, 2019, Letter, Gov't Exh. 1 at 9.) During his many meetings with Mr. Yoder, Mr. Wemhoff elaborated on how the Guidelines would apply. Along with explaining the Guidelines and their advisory function, Mr. Wemhoff told Mr. Yoder that the Court had discretion to stack the convictions and was required to consider the section 3553(a) factors. Finally, Mr. Wemhoff told Mr. Yoder that the Court could sentence him up to the statutory limits.

As was Mr. Wemhoff's practice with his other defendants, he did not insist on Mr. Yoder taking the Government's plea offer but did explain how the plea agreement could affect his case. On the other hand, upon receiving the plea offer, Mr. Yoder was eager to accept it even after being told by Mr. Wemhoff that he spoke with a witness who provided helpful information for Mr. Yoder's defense. Mr. Wemhoff remained neutral on the question of accepting the plea agreement, but Mr. Yoder insisted that he would take it "because if he did not take it, [the Government was] going to hammer [him]." (Tr. at 18.)

Contrary to Mr. Yoder's assertions in his filings, including his affidavit, there is no evidence to support that Mr. Wemhoff told him that he would, or could, spend the rest of his life in prison if he did not accept the plea agreement. The Court credits Mr. Wemhoff's testimony that he did not pressure Mr. Yoder in taking the plea offer, did not scream or yell at Mr. Yoder, and made no threats to him. This evidence mirrors Mr. Yoder's representations in the plea agreement and at the change-of-plea hearing that he was offering his plea of guilty freely and voluntarily and that no one forced nor threatened him to make him plead guilty. Moreover, Mr.

---

[3] As it turned out, Mr. Wemhoff underestimated the Guidelines range. According to the PSR, Mr. Yoder's total offense level was 24, which combined with his criminal history category of IV resulted in the sentencing guidelines range of 77–96 months of imprisonment. (PSR, DE 128 ¶ 100.) Mr. Wemhoff's estimate assumed a smaller intended loss and did not account for Mr. Yoder making misrepresentations in a bankruptcy proceeding and using sophisticated means to commit his crimes. (*See id.* ¶¶41–43.) Mr. Wemhoff's miscalculation tends to support his belief that Mr. Yoder was unlikely to receive a sentence amounting to a lifetime of imprisonment.

Wemhoff, who has been practicing law since 1988, at no time believed that Mr. Yoder would receive a maximum sentence or any sentence that would put him behind bars for the rest of his life. While he understood that the Court had wide discretion in imposing a sentence, in Mr. Wemhoff's experience, the judges, including this Court, sentence criminal defendants within or below the Guidelines range.

Mr. Yoder did not testify at the hearing and presented no evidence apart from Mr. Wemhoff's testimony. Therefore, Mr. Wemhoff's testimony stands uncontradicted, and there's no basis on which the Court could find that Mr. Yoder met his heavy burden in proving that Mr. Wemhoff provided ineffective assistance of counsel. Instead, as stated, the evidence shows that Mr. Wemhoff both reasonably estimated a likely sentence and communicated the results to Mr. Yoder. Therefore, Mr. Yoder's remaining claim is baseless.

### E.     Certificate of Appealability is Unwarranted

The Court declines to issue a certificate of appealability. A certificate of appealability may be issued "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts. The substantial showing standard is met when "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Slack v. McDaniel*, 529 U.S. 473, 484 (2000) (quoting *Barefoot v. Estelle*, 463 U.S. 880, 893 & n.4 (1983)); *see Young v. United States*, 523 F.3d 717 (7th Cir. 2008). For the reasons the Court has already discussed in denying the motion, the Court

11

does not believe that the resolution of this motion is debatable or that the issues deserve encouragement to keep proceeding.

The Court advises Mr. Yoder, though, that under Rule 22(b) of the Federal Rules of Appellate Procedure, when the district judge denies a certificate of appealability, the applicant may request a circuit judge to issue the certificate. If Mr. Yoder wishes to appeal this judgment, a notice of appeal must be filed within 60 days after the judgment is entered. Rule 11, Rules Governing Section 2255 Proceedings for the United States District Courts; Fed. R. App. P. 4(a); *Guyton v. United States*, 453 F.3d 425, 427 (7th Cir. 2006).

**E.    Conclusion**

For these reasons, the Court—

- DENIES Mr. Yoder's remaining claim that his trial lawyer provided him with ineffective assistance of counsel in relation to his entering the guilty pleas in Cause 3:17-CR-30 and Cause 3:18-CR-87; and

- DISMISSES his motions under § 2255 (DE 156 in Cause 3:17-CR-30; and DE 56 in Cause 3:18-CR-87).

SO ORDERED.

ENTERED: May 2, 2024

/s/ JON E. DEGUILIO
Judge
United States District Court